May it please the Court, I'm Drew Skarstein and I represent the appellates in this matter. Activists held that when a patentee pays a challenger to quit the patent fight, that it could lead to antitrust scrutiny. In the case below, which was on a motion dismiss, Judge Walls held that activists was limited to cash, and that therefore, since our case, the currency was in kind, that we did not meet the activist standard. Effectively, what Judge Walls held is that despite the fact that numerous courts have held that there's no functional difference between cash and kind as used as a currency, that if it's not cash, it would be per se legal. Our first challenge to Judge Walls, and what we submit is a major flaw in his decision, is that there is really no basis for him to hold that there's an immunity for transactions that only deal in kind. And this was very, very significant, because if you go back to the ruling in Activists... What forms of settlement, besides compromising on early date, early entry date alone, would enjoy immunity in your view? I don't believe that, as a whole, that we can actually characterize any type of settlement as immune. The Court looked to the early dates as when they specifically said normally that would not cause them concern. They never used the word immunity. And the reason is this, is because what the appellees are advocating, what Judge Walls effectively had, is that transactions without being scrutinized would be per se legal. Even transactions that we would typically acknowledge could cause antitrust harm. They made a blanket ruling when the Supreme Court actually was looking to have a rule of reason, that if, in fact, your case is plausible, then it should be subject to the normal process. So the authorized generic aspect of this is just part of that larger concept that you're mentioning? That's correct. The authorized generic was the currency, and that's what our concern was. If you step back for a moment and just look at the transaction, because it can be looked in different lights, and we pled it alternatively, is you have a situation where traditionally this would be a naked market allocation agreement. You have reciprocal agreements where the generic agrees to stay off the market for three years and quit the patent fight, and in exchange the brand agrees not to compete with the generic for six months. So that would be traditionally a naked market allocation agreement. If you look at it in the form of activists, it's the agreement for the brand not to compete that's the currency. That is, it's been described by many authors as worse than paying cash, because when you pay cash, the only harm to consumers is for the three-year period of the brand delay. Here there's the additional harm for the six months afterwards where there's no competition. But the Supreme Court said that there are some settlements that might be okay. Under a rule of reason analysis. So the court would actually review the facts in that case and actually look to that to see what it is. There have been, to my count, seven decisions. A full rule of reason analysis. If necessary. We would have to make out, which we feel we did, a plausible claim that there was potential antitrust harm here. One of the issues that's very, very important is what was the Supreme Court looking for? The Supreme Court was looking, did the payment from the brand to the generic induce the generic to quit? I'm having trouble hearing. I apologize, Your Honor. And I think it's off and on. Mr. Gerstein, could you make sure you stay back from the microphone, because I think that might be a factor. Thank you. Is this better? That's much better. Okay, I'll try to do that. If you look at the typical transaction where the brand is paying the generic, what the court said, that is substantial evidence to induce the generic to quit the patent fight and delay. In effect, what they're saying is that that is indirect evidence of the intent and the motive and what was going on. In the facts put in this case, we have direct evidence. I'm having trouble hearing again. In the facts in this case, we have direct evidence, and that is specifically that there was an admission by Teva that that was the quid pro quo for its quitting the patent challenge. So this case has some features. What about the fact that you didn't make any specific allegations about how much the no AG agreement was worth to Teva? My response to that, Your Honor, is one is that there's an evolution of the law and that our complaint was actually pre-catered, but we feel that the facts in that case are sufficient to clearly allow any jurist to conclude that there is a plausible basis that the payment was large. First of all, if you look to the Supreme Court — But isn't that ultimately necessary to do a rule of reason analysis? I believe not, and the reason is on two grounds. One is I think you have all the key facts in there, even though we didn't add them up. We talked about the size of the market. We talked specifically about what percentage of the market the generics would get and the price drop. So when you had, for example, the case that came down the other day, lidoderm, they used the same calculations by the FTC study and came to for a market that was slightly less than a billion dollars, they valued the authorized generic at something like $150 million. In our case, the market is $2 billion, and the FTC in the papers that they submitted in their amicus to Judge Walls valued our authorized generic at $400 million, and of course, we can always plead that. But my other answer goes to the point about what you're trying to accomplish. It would be a very, very rare case where the generic admits that I got paid, this is the quid pro quo. The other is just indirect evidence. We have that additional fact here that goes so far beyond. You don't have to assume or surmise what the payment was for. They tell you what the payment was for. The only thing you're saying is that we didn't meet formulaically adding up the numbers, and that, of course, we could do, and considering the evolution and the timing of this, I think that at a minimum, the opportunity to replead could be done quite reasonably. But as I said, this case actually preceded not only activists, but it even preceded Cater. So did the Supreme Court resolve the exclusivity of the license issue? I think that the exclusivity of the license issue was a red herring. The issue was what they said in the Supreme Court is that licenses are never automatically immune. You have to look at what they're used for. They cited numerous cases like line material, new wrinkle, et cetera. All it is is the license is taking an authorized generic and dressing it up for purpose, but functionally, we know what it is. But this case, there's a difference, and the difference is, and we also put this in our brief because it's a unique case. The license began on the day before the patent term expired. So 179 days of the license term was not under the Patent Act. There's substantial law that, you know, first of all, that any license that goes beyond the patent term is a misuse and could be illegal on itself. We're not arguing that. All we're arguing is defendants are looking to the Patent Act, and I think overlooking to that that it's a misuse, that it's specifically that it is an immunity on that basis. Well, if it's immune on that basis, it's immune only for one day. And they have tried to argue that the pediatric extension, pediatric exclusivity extends the patent term. It actually under the law does no such thing. What the pediatric exclusivity does is it's an act that's governed by a separate set of laws, the Federal Food, Drug, and Cosmetic Act. It is consecutive to a patent term if it attaches at all, and we said why it wouldn't attach in this case anyway. But if it is, it would be consecutive. And there is nothing in the Food, Drug, and Cosmetic Act that can even argue provide for immunity. So what they're looking to is the Patent Act to add some type of protection for one day, only because the Patent Act specifically enables an exclusive license. But the issue is the use of the license that really matters. And, you know, that is, you know, the basis. If I can just say one more point on that, and then I'll stop. I think there has been – You wanted to reserve how much time for rebuttal? Five minutes, if possible. If, in fact, if you look at the seven cases that have been decided, even the two cases that specifically found that activists was limited to cash, none of the cases relied on the license. The same argument has been made in every single case of the exclusive license. The two cases, Judge Walsh below and the Western case, specifically their basis was totally on the basis that activists spoke in money, so they just assumed that if it didn't speak in money, then it was limited to just money and not in kind. But nobody has actually adopted the argument that the defendants have made to this point. Thank you. All right. Thank you very much. Get your back on rebuttal. Mr. Hegedus? While you're coming up, I also want to acknowledge that one of the reasons I think the courtroom is so filled is that there are a number of students, I believe, from Judge Jordan's class at Penn. Is that correct? Raise your hands if you're from – yep, welcome. Glad to have you. May it please the Court, thank you very much for this opportunity to address why the Supreme Court's – Let's give your name just for this. Okay. My name is Mark Hegedus. And do you wish to reserve any time for rebuttal? No, Your Honors. Okay, thank you. The FTC appreciates this opportunity to explain why the Supreme Court's decision in FTC v. Activists applies to no-AG commitments. First, the economics of a no-AG commitment are straightforward. By promising not to launch a competing generic product, the brand foregoes revenues it could otherwise earn. This, in turn, enables the generic to capture substantially more revenues. Second, the economic substance of this type of agreement makes it a reverse payment under Activists. The generic receives something extremely valuable for which it had no claim in the patent litigation. And that agreement, that mechanism, is used to maintain super-competitive prices to be shared among the patentee and the challenger. And third, if upheld, the District Court's elevation of form over economic substance would offer pharmaceutical companies a roadmap to evade the Activists' decision and there would be resulting harm to consumers. These no-AG commitments are valuable to first-filing generics. The first-filing generic makes a vast majority of its money during the six months of Hatch-Waxman exclusivity. And the Supreme Court, in fact, acknowledged in the Activists' decision that this is the case. If the brand agrees not to introduce an AG during that time, the first-filer can possibly earn millions of dollars of additional revenues during that exclusivity period because it doesn't face competition from the AG. The reason for this is upon generic entry, volume quickly shifts from the branded product to the generic product. And brands have a strong economic incentive to introduce an AG in order to maintain and capture some of those revenues that would otherwise be lost to the generic. The FTC AG report actually found that most brands do introduce authorized generics in order to capture some of these funds. With a no-AG commitment, the first-filer with the six-month exclusivity is the sole beneficiary of that shift in volume from the brand to the generic. And in addition, because there is no competition from an AG, the prices that the generic receives are higher and consumers are harmed. There was a 2010 report that was done by the FTC that reported that 70 percent of patent settlements from, I guess, 2004 to 2009, did not involve compensation from the brand to the generic, combined with a delay in generic entry. So of that, do you have any idea how much was no delayed entry or was just no payment of that 70 percent number? Off the top of my head, I'm not able to cite for you what is the percentage between the no delayed entry and no payment. What I can cite to you is, in fact, the consistent finding in subsequent reports, including our 2012 report, that still finds a vast majority of patent litigation settlements settle without a payment from the brand to the generic. And of those that do settle with some kind of payment, in 2012, the last year for which I have publicly available figures, about half involved a no AG commitment. So one of our concerns with the district court's decision is that, if it's upheld, the generic companies and the branded companies will use that as an opportunity to structure their agreements so that they don't involve cash consideration, involve other kinds of consideration, and thus get around the activist ruling. Is the normal fear that you have found of the brand that it thinks that it may have a flaw with regard to its patent and if this case were to go to trial, it ultimately could be held invalid, or what? Certainly the studies that the FTC has done in the past have indicated that many patent challenges brought by generics are successful. The Supreme Court did not focus so much in activists on which percentage of the patent challenges were likely to succeed. Rather, the Supreme Court focused on the fact that when the brand uses its monopoly profits to buy off the challenge from the generic competitor, that that is the antitrust harm. It comes from the loss of that potential competition represented by the generics patent challenge. If the settlement involves early entry, that would be pro-competitive, would it not? It depends upon what is accompanying that early entry. That's why you have the rule of reason, I suppose. Among other things, Your Honor, the Supreme Court indicated that if the settlement is simply an entry date only settlement and there's no payment, then that normally does not present a problem. Although I hasten to add here that the Supreme Court did not say that those kinds of settlements enjoy a safe harbor, that they're immune from antitrust scrutiny. The Supreme Court basically rejected the idea that there's any kind of safe harbor or immunity when they rejected the scope of the patent test. All these agreements are potentially subject to review under the antitrust laws. What is required is that a plaintiff come in and make the allegation, first of all, that there is market power, and secondly, that there is some kind of an agreement that induced the generic to drop its patent challenge such that there is an adverse competitive effect. If those allegations are made and they're made plausibly, then the case proceeds. In fact, the complaint in this case alleges both things and ought to be permitted to proceed. What kind of review would it get? Would it get a full rule of reason review? The review would be a rule of reason review. The Supreme Court does indicate at the end of the activist discussion that district courts can craft the rule of reason to fit the allegations and the factual record in the case. For example, it normally would not be necessary to get into the patent merits. The court recognized, as it did earlier in the California dental decision, that the amount of scrutiny required under the rule of reason can vary from case to case. The court did reject the idea that there could be a quick look, but they did not say that, well, because we're in rule of reason land, it's got to be this very detailed, full-blown analysis. It really is going to be dictated by the facts in the individual case. Just, I guess, a dumb question. Has there ever been a pay-for-delay suit outside the pharmaceutical industry? Off the top of my head, I'm not aware of one. In terms of the ruling that the Supreme Court made, it doesn't preclude that. In fact, the Supreme Court, one of the reasons why they did not adopt a quick look in the context of this case, was a concern that there could be other industries where similar type of arrangements could arise. They didn't identify what those would be, but they said the fact that this rule would operate in more than just the pharmaceutical industry was one reason why they were unwilling to adopt a quick look in this context. With respect to whether or not the NOAAG acts as a payment, it certainly does, because what that NOAAG commitment adds to the generic revenues is potentially millions of dollars of added profits. I would point the Court to page 26 of our brief, which is page 34 in the ECF pagination, where we included a bar graph. The lower portion of that bar graph, the blue portion, represents the kinds of revenues that a generic would receive if it entered, had six-month exclusivity, and faced competition from an authorized generic. There is an initial red portion on that page in that bar graph that represents the additional revenues that the generic would receive because of the absence of competition from an AG. And those revenues represent substantial value. In fact, the studies that the FTC has done have indicated that those revenues, those added revenues from a NOAAG can represent around 40% to 50% of the revenues that the AG, excuse me, that the generic could be expected to earn during those first six months. That is very much a payment, even if it is not a check. The parties could have entered into or arranged their agreement in a different way. They might have actually had GSK in this case write a check to TEVA for the amount of money represented by the revenues that GSK decided not to take out of the market during those first six months. Instead of writing the check, and presumably that check would have qualified as a cash payment under Judge Wall's decision, the parties decided to simply let the generic, to let TEVA take those monies directly out of the market rather than funneling them through GSK itself. And GSK then had the benefit of monopoly revenues before generic entry. Those added revenues were then used to basically fund the payment to the generic after generic entry. Your Honors, I see the mic. You talk about payments that aren't really payments. Is there a better term that could be used across the board in this type of situation? Your Honor, the term payment as even Judge Wall's recognizes can be understood as not just a cash payment, but it could be some other kinds of giving of value. And I think the Supreme Court's decision in activists provides us some indication of what that might look like. They talk about what makes these kinds of arrangements suspicious is that the generic receives something that was not at stake in the litigation. In this case, the generic received the no AG commitment, even though if TEVA had won the litigation, the patent litigation, it would not have enjoyed freedom from authorized generic competition. So that additional element to the agreement is something that was not otherwise available and what makes it suspicious. I'm not sure there's another word other than payment to describe it. Perhaps we would call it some kind of consideration. But the Court focused on the fact that this type of settlement involves something that was not at issue, was not at stake in the litigation. The other part of it, and that goes to whether or not this complaint alleged a violation under the rule of reason, is was that payment used to induce the generic to drop its patent challenge? And here there is that allegation. Thank you. In your opponent's brief, they say your argument proves too much, accepting the premise that any value that any accused infringer derives from an early entry license under a patent settlement can constitute a reverse payment would automatically subject every early entry settlement to antitrust review. Is that an accurate statement? No, Your Honors. The Supreme Court supplied limiting principles to when a reverse payment qualifies or is suspect under the antitrust laws. And those limiting principles are, first of all, was the payment for something that wasn't at stake in the litigation? With a date entry settlement, basically you have a compromise as between the generic's claim to be able to enter immediately and the brand's claim that the generic shouldn't be able to enter until the end of the patent term. And they simply compromise sometimes somewhere in between those two dates. So when the generic can enter, that is what is at stake in the litigation. And if the agreement provides something to the generic that wasn't at stake in the litigation, such as a side deal for co-promotion or the no AG commitment in this case, that is one characteristic that makes it suspect. The other characteristic that makes it suspect is evidence that the payment was used to induce the generic to drop its patent challenge. And in this case, we have an allegation that Teva said as much. They said that we dropped our patent challenge because we received this no AG commitment. So there are those limiting principles, and it's not the case that every single reverse payment is potentially an antitrust violation. I will hasten to add, though, that that doesn't mean that there is this safe harbor where there are agreements that have no antitrust scrutiny. The thing that courts will use to, the vehicle that courts use to police whether or not an agreement does, or excuse me, whether a complaint states an antitrust violation is the pleading standards, are the pleading standards. Does the complaint plausibly state market power and an agreement that harms competition? If it does, it should be allowed to proceed. Thank you very much. Thank you very much, Your Honors. Here's Mr. Lefkowitz. Judge Roth, did you have trouble hearing Mr. Hagedus as well? There was one short interval where I had problems. It's sort of off and on. Basically, I heard enough of his argument to get it,  If you have any problems with either Mr. Lefkowitz or Ms. Mather, just let us know. Okay, thanks. Whatever you're ready, Counsel. Your Honors, may it please the Court, Jay Lefkowitz representing TEVA. Activists clearly did not intend to subject all patent settlements to antitrust scrutiny when the patentee only gives the defendant something intrinsic to the patent itself, expressly authorized by federal law. That can't be the kind of large and unexplained and unusual payment that activists was talking about. One of the key concerns here is what is a, quote, payment, obviously. And the problem you run into is sort of first semester of contracts in the first year of law school, where you think of payment as a form of consideration. And Black's Law Dictionary, that Brian Garner now puts out, defines payment as performance of an obligation by delivery of money or some other valuable thing accepted in partial or full discharge of the obligation. So why isn't something that's valuable to whether it's TEVA or GSK, why isn't that deemed to be a payment the way we would normally in our blink response understand it? Sure, I'd like to explain that in two ways. One, I think Judge Walz may have been a little blunt when he said cash and only cash. But cash is different. Cash, stock, bonds, real estate, those are all things outside the patent power. I can't do that even outside a litigation. I can't go to the CEO of a competitor and say, I'll pay you money if you don't gum on the market. That's very different from doing something that federal law expressly authorizes. And activists actually tells us that that's the right line. Activists at 2231 says, and it actually quotes 60-year-old Supreme Court precedent line material for this formulation. It said when we are balancing the tension between patent issues, which are of course at least short-term anti-competitive, and antitrust policy, what do we do? And it says to strike that balance, the court asked the question of whether the patent statute specifically gives a right to restrain competition in the matter at issue. And then two pages later, responding to the dissent, Justice Breyer says for the court, the dissent doesn't point to anything here in federal law that gives them the right to make the payment. But federal law does give the right to grant an exclusive license. And that's what this, what they call the no AG commitment. That is an exclusive license. Are you saying that a license is immune from scrutiny? Well, the Supreme Court answers that question, and activists too, because it draws a very clear divider, and this is on 2232 of the opinion, between the general lecture case on the one hand, which was the grants of an exclusive license that even had something much more anti-competitive than what we have here. A price limitation that said that the licensee had to sell at the patentee's price, and said we concede that that is acceptable. And then there are a whole host of cases, Lime Material, New Wrinkle, Singer, where you have patent pooling arrangements, horizontal arrangements with multiple patentees, effectively trying to utilize their patent for something beyond what the federal patent law gives them. So in answer to my question, are you saying that the exclusive licenses are immune from antitrust scrutiny? I think exclusive licenses, if they do not cross the line that the Supreme Court has made clear. If you grant an exclusive license, and all I've done is in a vertical way, one patentee grants one exclusive license to a licensee, that is immune. So that's what the general lecture case said, and the activist party raises that. In dealing with this, aren't you dealing with a valid patent? And in these patent settlement cases, you're dealing with a patent that is in question, that's dubious. The patent here, Judge Bissell has said that one of the important seven counts, he found the patent invalid. So if you are considering a settlement, is this quote within the scope of the patent, you can't assume then it's a valid patent. How can you say it's within the scope of the patent if you've got doubts about the patent? In every patent settlement, by definition, there is a challenge to the patent. In this particular case, there were both method and compound claims. The judge found that the compound claim, one claim of the compound, was not valid. The method patents were still being litigated and on a completely separate set of issues. We certainly don't look at patent settlements from a presumption of invalidity. That would turn 100 years of patent litigation on its head. And in fact, as to the FTC's point that Tevahir got something that he couldn't have gotten in the litigation, think of the typical patent lawsuit that goes on in every courthouse in America. Microsoft, for example, sues Google and says you're violating, you're breaching one of my patents. How does Google settle? They say, well, we're going to settle if you give us a license to a portfolio of patents. Something that they couldn't have won if they had won the lawsuit. Patent litigation is complex. And the Supreme Court did not say in activist that every single patent settlement buys you an automatic ticket to an antitrust lawsuit. It did say that if you do something outside the patent, and I'm not talking about the scope of the patent, I'm talking about using money to basically buy off your competitor. You can't do that under any federal law. So since there is no patent law that protects that conduct, the Supreme Court looked at that conduct through the antitrust lens and said that's anti-competitive. Here you have a license. And you also have something very different here. Tevah only made money. Every dollar Tevah made here it got by selling at an aggressive price to the consumers. It didn't get a penny from GSK. Did Tevah get here an exclusive license in your view? Did Tevah get an exclusive license? Well, I think Tevah tried to get an exclusive license. As it turned out, GSK I think wrote the contract in a way that allowed GSK to compete and to actually come on the market and discount its own brand. So there was clearly a lot of competition here. Now, could there have been even more competition? Perhaps. But, of course, what the Supreme Court tells us in Trinco is just because you could have had an even more pro-competitive agreement doesn't mean that the agreement you entered into is invalid. So Tevah's intent was to get an exclusive license? Tevah wanted to get an exclusive license, which it was entitled to, because GSK was entitled to grant it an exclusive license. What Tevah would not have been entitled to do would have been to say we will settle this case and we will agree not to compete with you in some other product. And GSK would not have been able to pay money to effectuate that. And maybe under activists, GSK couldn't even pay money to get the kind of settlement it got. But if we are going to read activists as basically saying that things that are expressly authorized by Section 261 of the Patent Act, 35 U.S.C. 261, that would be a real revolution in patent law. And it would be a very broad reading of what activists was dealing with, which was this highly unusual, unexplainable situation. I want to make a few other points before my time is out, if I may. Well, one question of you relating, and obviously activists is very important here. You pointed to a number of quotes from that. But at page 2237 of the Supreme Court Reporter, you pointed the statement that activists does not prohibit litigants in an infringement suit to, quote, as in other industries, settle in other ways, for example, by allowing the generic manufacturer to enter the patentee's market prior to the patent's expiration without the patentee paying the challenger to stay out prior to that point. It seems to me that the key language is the, right after the comma, without the patentee paying the challenger to stay away prior to that point. It would seem that the Supreme Court is making clear that an early entry can be pro-competitive, but only if unaccompanied by some other form of payment. Well, I think that's what the text says. And the way to understand that, through the prism of activists, with its references to the key question being is something authorized by federal law, is not to say any consideration. Excuse me, I'm having trouble hearing. I'm sorry. Can you hear me now? I think the mic is very sensitive. And what happens is perhaps there's some reverberation if you get too close. Okay. Sorry. I'll try to do this. Yeah. I think what the FTC is trying to say is any form of consideration should be treated as a payment. But think about the early entry license. If I say you can come on early, you have to know, what's your geographic scope? Is it ex-U.S. or is it within the U.S.? East of the Mississippi, west of the Mississippi. Is there going to be exclusivity or not? Is there going to be a royalty payment or not? All of these are terms. It's kind of like if I offer you a job and I offer to pay you $20,000, you might say is it for one month, is it for one year? These are all terms of the license. And the exclusivity is a term of the license. No differently than geography, no differently. And, by the way, if you move the geographic scope, if I'm going to get more geography, then I would move the date of the entry. So is that now going to be deemed a pay for delay? I don't think the Supreme Court painted with that broad a brush. I think what the court did when it recognized the vitality of the General Electric case, which was an exclusive license even with a price requirement, which is much more anti-competitive than what we have now altogether. Can you hear? I cannot hear. Can you hear me? I can hear you, but the sound disappeared altogether. It comes and it goes. I will have a recording, you know, that I can read the argument. And we'll have a transcript prepared of this oral argument to make life better. I will note now that we'll ask both sides to have a transcript prepared and split it between your side and that side. If I may make just two final points before I sit down. One is I just want to correct one misrepresentation from the plaintiffs, which is the claim that this is a naked market allocation because it extends beyond the exclusivity period here. The parties were very careful to negotiate two different entry dates because at the time the negotiation was done, they knew that the brand was going to ask for this pediatric exclusivity, which acts, and the D.C. Circuit has made this clear, and the Federal Circuit has made this clear. It acts as an extension of the patent period. It's another government period of monopoly. And they said if GSK gets that, then the early entry will be six months prior to the end of that. And if they don't get that pediatric exclusivity, then it's four and a half months before the end of the patent. So in both events, what Teva was getting was early entry, and the early entry is clearly competitive. They were actually getting early entry in a contract, which GSK competed with them. To be sure, maybe there could have been a more pro-competitive in the short-term contract. But again, the key here is parties have to be free to settle. And the lines that both the FTC and— Well, I think the Supreme Court's saying you're free to settle, but there's going to be a rule of reason analysis as to whether that settlement is a violation of antitrust law. I think if the court had intended to subject all patent settlements to rule of reason analysis, even all patent settlements in the drug context, they would have said so. And there are two very clear reasons— That sounds a lot like the dissent in Teva's— No, but there are two specific things that the court said that I'll leave you with, if I may, that I think make it clear that the court wasn't driving at such a broad ruling. Number one, it made clear that General Electric, the conduct at issue in General Electric, is safe and immune. It said that's on the appropriate side of the line. And that is clearly a sole licensing agreement, exclusive even with price support. Number two, the court said there may be other ways in which parties can settle, including, for example, it wasn't even using the early entry as the sole safe harbor. It acknowledged that there were ways to do this. And all I'm trying, I guess, to clarify for the court here is that even the early entry itself, which they hold out as the prototypical, you know, pro-competitive, even that has context in which it could be anti-competitive. If I were to get an early entry— Well, I think Mr. Haggis said that. I could get more, perhaps, and that might be anti-competitive in certain respects. I think the clear line that we should draw from the activist case is that when you use money that's outside the patent to try to buy off a competitor, the Supreme Court said that's suspect. That gets rule of reason analysis. But when you are availing yourself of what federal law specifically authorizes you to do, the Supreme Court has said that's on the right side of the line, and that's the lesson that the court learns and brings forward from line material. Thank you very much. Ms. Mather. Thank you, Your Honor. I'm Barbara Mather. I represent GSK in this matter. Judge Roth, can you hear me? Let me try— I'm hearing you loud and clear right now. Okay. Well, let's hope it continues. Raise your hand if it doesn't, please. I want to switch— No, I'll make it short. Thank you. I want to switch the subject matter a little bit, and then I will return a little bit to some of the points that the court asked about and that my colleague, Mr. Lefkowitz, mentioned. The point I'm going to argue for you first, Your Honors, is that the plaintiffs have not pled, in this case, a plausible claim on the competition. They have a couple of theories in the complaint. They would have won the patent case. The Teva would have won the patent case. They would have negotiated a better settlement. They would have launched a risk. Those are all sort of over the moon in terms of speculation. The real claim that they have made here is that it is based upon the exclusive license that Mr. Lefkowitz has been talking with you about, and that theory is that GSK simply agreed not to compete. Now, there's a fundamental problem with that in this case, and that's that GSK did, in fact, compete. GSK, prior to Teva's launch, offered discounts to pharmacies, pharmacy chains, group purchasing organizations, and long-term care facilities. So, in effect, what you're saying is you can do a rule of reason analysis if you want, but we still win. What I'm saying, Your Honor, is that both under the law and under the pleading rules, there's no complaint pled here, and that we don't have to get to a rule of reason analysis. And it's not, what did they have to plead in order to get to a rule of reason analysis then? They have to plead some large payment, and you can't plead a large payment by just saying, there was a large payment. I'm sorry, I can't hear you. You cannot hear? I can't hear you. Okay. Can you hear me now? Can't hear you. Sorry. I'm in the same place, Judge Roth, so I'm not sure what I can do about it. Back up just one second. We'll just try a couple of questions. I think if you stay away from the microphone, it helps. Yeah, that's a good idea. Let me try that. Is that better? Yeah. That's much better. All right. Let me keep putting it off to the side a bit. Judge Kavanaugh in this situation, Judge Ambrose, found that GSK had expressly reserved the right to compete, that GSK had used a highly effective means of competition, and that competition between the branded and generic was precisely what the agreement between the parties envisioned. What they would have to plead, to return to your question, is what was the value? Was there something of large value exchanged here? And they absolutely have not done that. The FCC today has put forward a nice explication of what an average benefit would be for somebody who agreed to no authorized generic and didn't do anything else. But that's not what happened here. What happened here is that GSK came in, and the customer in the market would have had three choices right after Teb entered. They would have had Teb's generic price, they would have had GSK's branded price, and they would have had GSK's branded, discounted to the generic level price. There is absolutely nothing in the complaint. The complaint does acknowledge that GSK made that move. But there is nothing in the complaint that gives either the court below or this court any basis for concluding what advantage there was to Teb. When you say something of large value, so it doesn't necessarily have to be cash, is that correct? I think I'm with Mr. Lefkowitz, not surprisingly, on the issue of it has to be cash or something of cash value. But even if you say it has to be a kind of an inclined exchange, you have to give it some value. You can't just plead large payment. You have to give it some value. And there's no value and no basis for that. Now, does that pick up to some extent on Judge Sheridan's way of doing his analysis? I think Judge Sheridan is right, frankly, on his way of doing his analysis. And the plaintiffs have said, well, we should have another chance here. But, you know, they had a chance. After activists, this case went back. They didn't have anything. They didn't conclude any additional analysis. And I think, Your Honor, it's right not only as a matter of pleading that there is no basis for concluding that there's a large payment here and, therefore, no claim, but it's also right as a matter of law. What they are arguing, essentially, and they even say it in the complaint, they say the competition was less effective. The competition was weaker. I'm not hearing anything. Let me try it here, Your Honor. Any better? Sorry, I'm not hearing anything. Not a thing? Now I hear you again, okay. Okay, let me say it again. Okay, yeah. What they say is that the competition was weaker, the plaintiffs in their complaint. They say it was less effective, but they don't say it didn't exist. Trinco, a well-known Supreme Court decision, says that it's not the function of the courts or the parties to decide what the best form of competition is or to take a form of competition that exists and say, well, it could have been better, and, therefore, we ought to conclude that somehow it violates the antitrust law. But, you know, at this point, we aren't really looking to see whether it violated the antitrust law. We're looking to see whether we ought to take a look at it. That's right, Your Honor. We aren't trying to decide the case in toto right now, and if there is something that is conveyed that is of value, which is beyond what was at issue in the patent litigation, isn't that reason enough to go into a further investigation of whether there was any competitive activity? No, Your Honor. And in this particular case,  is that there was a better form of competition, I think Trinko and, indeed, American Motor Vans in this circuit both say that's not enough to get you to the point where you've pled an antitrust violation. They're not pleading cases, but they say that's not a theory, a viable theory for an antitrust case. So I think if you don't cross the viable theory line, you don't get to the rule of reason. Now, let me turn to the rule of reason and perhaps a more direct answer to your question. I think both Mr. Gerstein and his colleague today have said that all... Can I just ask one question at the outset? Sure. Once you get to the rule of reason analysis. What should we make of the fact that Judge Walls declined to conduct any analysis of market power in this case? Well, Your Honor, I don't think in this case, I'm not sure market power would be a huge issue. I don't know whether it would be an issue, frankly. Maybe it's not necessary. But I don't think you'd get to it if you don't have an antitrust theory that works. And if you haven't pledged something... Because the patent gives you a monopoly in effect? Yes. And I don't think you'd get to it because you haven't pledged an antitrust theory that works and because you haven't pledged anything at a payment of value. Let me go back to the rule of reason, if I may. Judge, did you have a question? I'm sorry, but I'll get to it right now. Okay. I think both Mr. Gerstein and his colleagues said effectively, in response to your original question, Judge Ambrose, that all settlements would be subject to scrutiny. And I think that is indeed the answer. And Judge Roth, you mentioned that there was an issue as to whether, well, isn't the patent in doubt and therefore isn't that appropriate? But one of the things that the FTC study finds, very interestingly, is that it is worth it for a generic to challenge a patent if it has a 4%, 4% chance of success. There is no viable presumption that because there's a challenge the patent is not viable if, in fact, 4% is enough to make it economically a good deal. As Mr. Lefkowitz has said, patentees and litigants have been using licenses for many, many, many decades to settle disputes. Limited licenses in the pharmaceutical area and outside the pharmaceutical area are common. Several of the amicus... But a license could be subject to antitrust scrutiny, could it not? It could, Your Honor, if it goes beyond the scope of the patent. Well, I thought scope of the patent was kind of put aside in activists. No, I mean if it goes to products outside the patent. Let me put it that way. That's a clearer answer. Or if it goes, for example, to patentees getting together and saying we'll cross-license each other and, by the way, we'll drive the market. That's clearly illegal. But what we're talking about here is a single license between a patent holder and the licensor. Those have been used for decades. They've been used in lots of different ways. Some of them limit the scope of the products or the formulations. Some of them limit yields of use. Some of them limit territories. Some of them settle for higher or lower royalties or specified contracts. Think about it. Every single one of those, every one, can be recast as a patent. If you have a limited territory, the right to sell in Puerto Rico could be argued to be an agreement to delay sales in the continental United States. If you have a limited field of use, the right to sell in that use could be used as an argument that you're delaying in other areas where you don't have the right to sell. And so on. Every one, every single settlement can be converted into a dollar value by future litigants and argued about as a hidden payment. And so you're arguing that the consequences of that are bad or what? Highly inefficient or? The effect is to make settlements much, much more difficult. Well, again, that sounds like what the dissent said in Activist. But Activist said, and I can't cite you to page as Mr. Lefkowitz did, but it did say that settlement had value. And it did talk, as Mr. Lefkowitz has laid out in some length, about the traditional license cases, and it did not disparage those cases. If anything outside, if all of those license terms were to be brought in, then, in effect, what you were going to be doing is every time a patentee settles a challenge to the patent for anything more than the date, and the date is a hard thing to settle for if the parties disagree about what the date should be. Every time you settle for more than the date, you're going to be buying a full rule of reason analysis. I'm not hearing you. I'm sorry. Can you hear me now? Can you hear me now? Keep moving. Sometimes that works. Does that help? No. I give up, Judge Roth. I only have five more minutes. I'll read the transcript. Every time you settle a patent case, you're going to be signing on for a full rule of reason analysis. That is a terrible deal. It is going to actually disturb settlements. The activist case did say while settlements were not important enough to overcome the presumption in that case, they were important. This is going to make them. This rule is something to draw upon under activists and for the courts in the future litigation in this area. Thank you. Thank you very much. Mr. Gerstein. Yes, sir. What are the limiting factors? Why is Ms. Mather wrong about this? Before you start, Tony. Judge Roth, can you hear Mr. Gerstein? Can you hear me? Yes, I can hear you right now. I'm sorry. Go ahead, Tony. I apologize. Why is Ms. Mather wrong on this? The argument she made was the same argument that was rejected in activists. What she just said is there are plenty of times, for example, a settlement just on the patent term, splitting the patent term. Parties can't reach a settlement. And what she said was, well, we need a device. Well, that was what was argued for cash or what they say would be cash. The court rejected it. They're saying, look at the, whether or not there is a transaction here that can have antitrust effect. Go beyond the form of the transaction. And that's what I keep on hearing from them when talking about form. And what you're raising is a very, very important point from our perspective. Where the parties differ the most is we want the opportunity to challenge transactions that would have antitrust effect. They want an immunity in specific examples even if they could have antitrust effect. That is the issue that was fundamentally before activists and that's the issue before this court. If I had walked into this court and said, I have absolute proof that Teva and GSK got together, they both recognized in January 2005 during the trial in front of Judge Bissell that the patent was going to be invalidated. And they got together and they said, look, we know that the patent was worthless, but we'll give you the no AG if you'll agree to delay to the end of the patent term, one day before the end. They would say even that, even the recognition by both parties that they're doing an antitrust transaction that would be contrary to the antitrust law, they would say that should be immune. What we're saying is subjective to the rule of reason and the appropriate circumstances. The other issue I have which really... Well, appropriate circumstances seems to be pretty large in your book. Well, you have to go to the plebians and this is one of the problems I have. For example, they just made a big point, which is what the lawsuit would be about, that despite the fact that Teva and Mr. Lefkowitz admitted that Teva expected to get an exclusive license, but they were snooping by GSK. So they look after the fact. The question is what is the agreement of inducement? Well, certainly consumers weren't really hurt by that action of GSK. And we've pledged that. That's the point. We've been litigating these cases for 15 years. But how so? If the prices were brought down from the branded level even to the generic level? This would come out actually during the discovery and the trial. What happens is there is a specific means of sale and distribution that's unique to the pharmaceutical industry. There were what's called the law of 50 states generic substitution laws whereby the pharmacist automatically would substitute a generic for a brand if the generic was on the market. What GSK tries to do is circumvent that by having the pharmacist go through a long and difficult process of converting it back to a brand. And what happens is there is obviously some effect on the sales of Teva, but that doesn't mean it changed the value or didn't have, nonetheless, significant consumer harm. That's what we developed during the lawsuit. And we specifically pledged that based on the writings that we have and the knowledge we've obtained in litigating these cases through the years. That is pledged specifically in the complaint. They come up there and say there was competition. Well, there's a big difference if, in fact, the competition is 5% or it's equal competition. And here the branded, in trying to compete in that market, seriously hurts itself. First of all, it cannibalizes whatever's left of the branded market. We're always able to retain a small percentage of the market for people who only buy a brand. By lowering the product price, it cannibalizes that. And it also is very, very incomplete competition. So the net effect is, one, it's a significant value to Teva, which we will prove, and which we allege. And it also has a significant anti-competitive effect to the consumer. But when you said also, which is very, very important, how does that hurt consumers? It brought three years of delay. Even if it didn't hurt consumers in the aftermarket, they brought three years of delay. That three years of delay hurt the consumers because they had to pay their full brand price during that period of time. And that is the initial antitrust case. They also mentioned General Electric. And I think that this is very important because General Electric is a very different case. There was no patent dispute in that case. The basic understanding was the patent term. Parties acknowledged the full patent. And then the licensing under the patent in the monopoly. Here, and that's exactly what goes to the activist analogy, is the patent was at issue. And the brand bought off the challenger to avoid that ruling. That's a very, very different situation as an exclusive license. They can't point to any case, typically, where a license, exclusive or otherwise, is used as the currency to effectuate an anti-competitive transaction. That would be per se immune. And that's what they're saying. They want this court to say, on the facts of this case, even when they had gone through a trial, a bench trial, where the judge issued his first ruling on claim one, which went to the actual... Well, I think Ms. Mather's argument is a bit different than that. She's saying that at the outset, at the pleading stage, nothing of large value was exchanged. And this is very, very important. Obviously, in preparation for this, we go back to that. Activists never has a specific quantitative requirement. Never has a quantitative test. You go through it, you will not find it. They have a qualitative test. Specifically, did the payment, the reverse payment, induce the challenger, the generic in that case, to quit the patent fight? We may have not put a dollar number in the complaint, as I said before, but we have all the information that would clearly indicate to anybody reading it that it was worth hundreds of millions of dollars. But more than that, if it's a quantitative test, you have it in spades here because you have the direct evidence of it. You haven't ever admitted it. You had their lawyer just telling you right now, that's what we bargained for. That is the fact, is we expected... We quit the challenge fight. That's what they say explicitly. That was the quid pro quo for our quitting the patent fight was the no AG. And if, in fact, the Supreme Court wanted to create some type of quantitative test, they would have given some indications. What they want to do is leave it to the court to look at the substance of the transaction. What would it take to induce the challenger to quit the patent fight? That's the only thing that you're going to find in accuracy in your reading. The only other question that they have is, the only other dollars they point is your avoided litigation costs. They don't even use that as a test specifically for benchmark. They say that's a justification that the defendants can come back to a different place. In fact, plaintiffs established that there was a payment that induced. So that is very, very different. Ms. Mathis says also, when we were saying overbought stroke, is she saying that every license that could somehow otherwise mask an antitrust violation should be, per se, legal because it would be automatically dismissed. My last point is, every single point that they raised on the quid issues were not addressed by Judge Walsh. They weren't made below specifically. Obviously, this was pre-accuracy. It was not the basis of Judge Walsh's holdings. As I said, that was the very, very first case. Our, you know, his second denial was the very first case after accuracy. So what ultimately are you looking for? I'm looking specifically to have the court reverse the judge on the denial of the dismissal of the complaint under 12b-6, allow us to... On the issue of payment? On the issues that we made out of the antitrust violation. We've also alleged in the alternative, which activists have never overruled, that it is a naked market allocation agreement. You have agreement here on time, but you have a naked market allocation agreement. So what we believe is we have a clear basis to proceed under this and to come in and argue facts that would clearly be outside the complaint and clearly be disputed during discovery and through trial is inappropriate, we believe, under a motion, a 12b-6 motion. Thank you very much. Thank you to the 12th Council for very well-presented arguments. As noted, we would like to have a transcript prepared of this oral argument and to have it split between Mr. Gerstein's clients and decide however you want to split your half. And I guess quarter quarter, maybe? I don't know. But again, thank you. It's a pleasure having you here. Thank you very much.